## RECORD NO. 17-1075

# In The
# United States Court Of Appeals
# For The Fourth Circuit

## DEBORAH MEEK HICKERSON,

*Plaintiff - Appellant,*

v.

## YAMAHA MOTOR CORPORATION U.S.A.; YAMAHA MOTOR COMPANY, LTD.,

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT ANDERSON

———————————

## BRIEF OF APPELLANT

———————————

Douglas F. Patrick
Austin F. Watts
COVINGTON PATRICK HAGINS
  STERN & LEWIS, P.A
P. O. Box 2343
Greenville, SC  29602
(864) 242-9000

David G. Owen
DAVID G. OWEN, PA
305 Colleton Avenue SE
Aiken, SC  29801
(803) 644-1441

*Counsel for Appellant*

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA  23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 17-1075        Caption: Deborah Hickerson v. Yamaha Motor Corporation USA

Pursuant to FRAP 26.1 and Local Rule 26.1,

Deborah Hickerson
(name of party/amicus)



who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Austin F. Watts                    Date: ___January 31, 2017___

Counsel for: Appellant

## CERTIFICATE OF SERVICE
***************************

I certify that on ___January 31, 2017___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Robert H. Hood, Jr., Esquire          Richard A. Mueller, Esquire
Walker Barnes, Esquire                505 N. 7th Street, One US Bank Plaza
PO Box 1508                           St. Louis, MO 63101
Charleston, SC 29402

s/Austin F. Watts                        January 31, 2017
___(signature)___                        ___(date)___

# TABLE OF CONTENTS

PAGE:

TABLE OF AUTHORITIES ................................................................................................ iii

STATEMENT OF JURISDICTION .................................................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................................................ 1

STATEMENT OF THE CASE ............................................................................................ 1

    I.    Facts ................................................................................................................ 1

    II.    Procedural History ..................................................................................... 3

SUMMARY OF ARGUMENT ........................................................................................... 6

ARGUMENT ..................................................................................................................... 7

    Standard of Review ........................................................................................ 7

    I.    The District Court Erred in Ruling that Appellees' *Warnings* Prevented the Appellant's Claim that the Jet Ski was Defectively *Designed* ........................................................................................................ 9

        A.    Warning and Design Defects are Independent Bases of Liability ........................................................................................... 9

        B.    The South Carolina Supreme Court Would Reject the District Court's Erroneous Interpretation of the State's 402A Act ................................................................................... 11

        C.    The South Carolina Supreme Court Would Recognize that Warning and Design Defect Claims under the 402A Act Are Independent Actions ...................................................... 14

            1.    Holding That Warnings Trump Design Safety Is Contrary To the Independence of the Three Types of Defect ................................................................................. 14

i

2.    Design Defect Liability Is Vitally Important to Society ...................................................................14

3.    Holding That Warnings Trump Design Safety Would Revive the Long-Discredited "Patent-Danger Rule" In Design Defect Cases ...........................15

4.    Plucking Part of a Single Sentence of Comment J Out of Context Is Contrary To South Carolina Law ......16

II.    The District Court Erred in Ruling that Yamaha's Jet Ski Warnings Were Adequate as a Matter of Law ....................................22

A.    The District Court Wrongfully Excluded Expert Testimony By Assuming Its Basis Instead of Conducting a Reliability Analysis....................................................23

B.    The Court Erred in Ruling Effectively that the Jury Could Not Determine Adequacy of a Warning Without Expert Testimony .......................................................29

C.    The District Court Erred By Usurping the Role of the Jury and Weighing the Evidence on the Inadequacy of the Jet Ski Warnings ........................................................34

CONCLUSION ...................................................................37

STATEMENT REGARDING ORAL ARGUMENT ...........................................38

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

PAGE(S):

CASES

*Aldana v. R.J. Reynolds Tobacco, Co.*,
    2007 WL 3020497 (D.S.C. 2007)..................................................................38

*Aldana v. RJ Reynolds Tobacco Co.*,
    2008 WL 1883404 (D.S.C. 2008)..................................................................13

*Alford v. Lowe's Home Centers, Inc.*,
    2014 WL 5305825 (D.S.C. 2014)..................................................................34

*Allen v. Long Mfg. NC, Inc.*,
    505 S.E.2d 354 (S.C. Ct. App. 1998) .....................................................12, 30

*Anderson v. Green Bull, Inc.*,
    471 S.E.2d 708 (S.C. Ct. App. 1996) ...........................................................12

*Babb v. Lee County Landfill SC, LLC*,
    747 S.E.2d 468 (S.C. 2013) ...........................................................................30

*Binakonsky v. Ford Motor Co.*,
    133 F.3d 281 (4th Cir. 1998) ...........................................................................7

*Bradley v. Ameristep, Inc.*,
    800 F.3d 205 (6th Cir. 2015) .........................................................................29

*Branham v. Ford Motor Co.*,
    701 S.E.2d 5 (2010)..........................................................................9, 20, 21

*Charbonnages de France v. Smith*,
    597 F.2d 406 (4th Cir. 1979) ...........................................................................8

*Claytor v. Gen. Motors Corp.*,
  286 S.E.2d 129 (S.C. 1982) .....................................................................13, 16

*Curcio v. Caterpillar, Inc.*,
  543 S.E.2d 264 (S.C. Ct. App. 2001), *rev'd on other grounds*,
  355 S.E.2d 272 (S.C. 2003) ..................................................................................13

*Curcio v. Caterpillar, Inc.*,
  585 S.E.2d 272 (S.C. 2003) .............................................................................29, 30

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).............................................................23, 24, 25, 28

*France v. Smith*,
  597 F.2d 406 (4th Cir. 1979) ...........................................................................8

*Gasque v. Heublein, Inc.*,
  315 S.E.2d 556 (S.C. Ct. App. 1984) .............................................................31

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)

*Glittenberg v. Doughboy Recreational Indus.*,
  491 N.W.2d 208 (Mich. 1992) ....................................................................19

*Hodges v. Rainey*,
  533 S.E.2d 578 (S.C. 2000) ........................................................................16

*James v. Jacobson*,
  6 F.3d 233 (4th Cir. 1993) ...........................................................................8

*Jones v. Chandrasuwan*,
  820 F.3d 685 (4th Cir. 2016) .......................................................................8

*Marshall v. Lowe's Home Center, LLC*,
  2016 WL 4208090 (D.S.C. 2016).........................................................*passim*

*McCullock v. H.B. Fuller Co.*,
  981 F.2d 656 (2d Cir. 1992) ......................................................................30

*Md. Cas. Co. v. Therm-O-Disk, Inc.*,
    137 F.3d 780 (4th Cir. 1998) ........................................................23

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008) ........................................................29

*Private Mortg. Inv. Servs., Inc. v. Hotel and Club Assocs., Inc.*,
    296 F.3d 308 (4th Cir. 2002) ..........................................................8

*Rogers v. Ingersoll-Rand Co.*,
    144 F.3d 841 (D.C. Cir. 1998) ......................................................19

*Ruggiero v. Yamaha Motor Corp., USA*,
    2017 WL 1197755 (D.N.J. 2017) ..................................................30

*Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*,
    377 F.3d 408 (4th Cir. 2004) ..........................................................7

*Watson v. Ford Motor Co.*,
    699 S.E.2d 169 (S.C. 2010) ....................................................10, 13

*White Oak Manor, Inc. v. Lexington Ins. Co.*,
    753 S.E.2d 537 (S.C. 2014) ..........................................................16

*Williams v. Pioneer Machinery, Inc.*,
    2004 WL 6249103 (S.C. Ct. App. 2004)..................................10, 16

## STATUTES

21 U.S.C. 1367 ..................................................................................1

28 U.S.C. § 1291 ..............................................................................1

S.C. Code Ann. §§ 15-73-10 et seq. ..............................................11

S.C. Code Ann. §§ 15-73-30..........................................................17

## RULES AND REGULATIONS

Fed. R. App. P. Rule 34(a)(2) ...................................................................38

Fed. R. Civ. P. 59(e) ..............................................................................5

Fed. R. Civ. P. 702 ...............................................................................8

Fed. R. Evid. 702 ..........................................................................*passim*

Fed. R. Evid. 702(a) ...........................................................................29

Local Rule 34(a) ................................................................................38

S.C. R. Evid. 702 ..............................................................................29

## OTHER

David G. Owen and Mary J. Davis, Owen & Davis on *Products Liability*,
 § 6:3 (Thomson Reuters 4th ed. 2014) ...........................................19

David G. Owen and Mary J. Davis, *Products Liability* and Safety:
Cases and Materials (Foundation Press 7th ed. 2015) ...........19, 24, 29, 32

David G. Owen, *Products Liability in a Nutshell*,
 § 6.2 (West 9th ed. 2015) ....................................................11, 19

David G. Owen, *Products Liability Law*,
 § 6.2 (West 3rd ed. 2015) ...........................................11, 14, 15, 21

David G. Owen, The Puzzle of Comment j,
 55 Hastings L.J. 1377 (2004)......................................................19

David G. Owen, *Warnings Don't Trump Design:
The Rise and Fall of § 402A Comment j*,
 153 *Products Liability* ADVISORY 1 (Nov. 2001)........................................19

L. Frumer and M. Friedman, *Products Liability*
 § 12.03[1] (C. Sklaren rev. ed. 2017)............................................32

Restatement (Second) of Torts § 402A...........................................................*passim*

Restatement (Third) of Torts § 2 ...................................................................*passim*

## STATEMENT OF JURISDICTION

This appeal arises from a *Products Liability* action, over which the District Court of South Carolina had diversity jurisdiction between Plaintiff Deborah Meek Hickerson and Defendants Yamaha Motor Corp., Ltd. and Yamaha Motor Corp., U.S.A., pursuant to 21 U.S.C. 1367.  Appellant Hickerson appeals from the District Court's orders (1) granting Summary Judgment for the Appellees Yamaha on all claims on August 16, 2016, and (2) denying Appellant Hickerson's Motion to Alter/Amend the Order Granting Summary Judgment on December 16, 2016.

Appellant Hickerson timely filed a Notice of Appeal from these final Orders on January 18, 2017.  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    Whether Yamaha's Warnings on Its Jet Ski Precluded the Plaintiff's Claim that the Jet Ski was Defectively Designed?

2.    Whether the Jet Ski Warnings Were Adequate as a Matter of Law?

3.    Whether the Plaintiff's Expert Was Prepared to Testify Reliability as to the Inadequacy of the Jet Ski Warnings?

## STATEMENT OF THE CASE

## I.    Facts

This appeal is a *Products Liability* action against Yamaha Motor Corporation, Ltd. and Yamaha Motor Corporation, U.S.A. (collectively "Yamaha"), alleging that

Yamaha designed and sold a personal watercraft, commonly known as a "jet ski," which caused severe personal injuries to the Plaintiff-Appellant, Deborah Hickerson. On June 30, 2012, while riding as a passenger on a Yamaha jet ski, Hickerson suffered injuries to her rectum, perineum, vagina, and anus (orifice injuries) when she fell off backwards into the powerful jet stream emitted by the craft.  (J.A. 2)

In a *Products Liability* action against Yamaha, Ms. Hickerson alleged that the jet ski, which Yamaha called a "pocket rocket," was defective in several ways, principally concerning Yamaha's failure to offer passengers reasonable protection through design, but also including a failure to adequately warn of certain severe risks of personal injury. (J.A. 18-19, 1011)

The design defect claims relate to the jet ski's seat, which had various design problems: it had neither seat straps that a passenger could grab nor was it equipped with Yamaha's "safety contour" seat, an interchangeable seat with a sloped seat-back to aid passengers in staying on the watercraft.  (J.A. 693-94, 1009)

Dr. Anand Kasbekar, whom the district court qualified as both a design and warnings expert,[1] testified on the design defect claim that Yamaha's "safety

---

[1] Dr. Kasbekar has his Ph.D. in Mechanical Engineering and Material Sciences from Duke University and specializes in those fields "with an emphasis on accident investigation, failure analysis, safe product design, computer simulation and 3D-visualization." (J.A. 719) With nearly 30 years "experience in the application of computer simulation and scientific visualization to the field of forensic engineering," Dr. Kasbekar has worked in the areas of "forensic

2

contour" seat design would have prevented Hickerson's injuries had it been utilized on the jet ski. (J.A. 688)  He further testified that simple seat straps for passengers to hold also would have protected passengers like Ms. Hickerson.  (J.A. 693)

As for the warnings claim, Dr. Kasbekar first opined that the warnings of orifice injuries present on the jet ski were in various respects inadequate to communicate this risk effectively to passengers, as attested by industry practice (J.A. 411-12), industry standards (J.A. 413-14), his on-water testing (J.A. 690-91), and as based generally on his knowledge, skill, experience, training, and education (J.A. 719-723)  Next, with help from another warning expert, Dr. Kasbekar developed and proposed a suitable warning for the craft—more succinct and placed in a better location—where the serious risks and means of avoidance would have been more likely seen by passengers. (J.A. 569-70)

## II.    Procedural History

This is an appeal from the District Court's grant of Yamaha's motion for summary judgment on all Ms. Hickerson's claims.  Because the appeal stems from a curiously inconsistent ruling, an explanation of the case's procedural history should be helpful.  Yamaha filed a motion *in limine* to exclude Dr. Kasbekar as a design defect expert and as a warnings expert and to exclude his testing, analysis,

---

engineering, materials characterization, product liability, and failure analysis" as part of his consultation work with Research Engineers, Inc. since 1987, and he has taught mechanical engineering at Duke University since 1995. (J.A. 719)

3

and opinions on those respective issues. (J.A. 259)  Initially, the District Court ruled that Dr. Kasbekar was qualified to provide expert opinions that Yamaha's jet ski's design and warnings were both defective.  (J.A. 1250, 1256)  The Court also ruled that his design defect testing and opinions were reliable. (J.A. 1256-61)  But it further ruled, in the *in limine* order—in an order it later conceded was "not clear" (J.A. 1457)—that Dr. Kasbekar's proposed *alternative* warning was unreliable—because he supposedly had not tested it nor supported it with any "specific relevant research." (J.A. 1253-54)

In addition to its *in limine* motion, Yamaha moved for summary judgment, arguing essentially that without reliable expert testimony Hickerson could not prove her case.  (J.A. 49)  Although the *in limine* ruling appeared to have previously decided this motion against Yamaha, such that both parties continued discovery, the Court issued an opinion on August 18, 2016 granting summary judgment for Yamaha on all claims.  (J.A. 1262)

In excluding for the first time Dr. Kasbekar's opinion that Yamaha's warnings were inadequate (and, hence, defective), the Court stated that "his proposed warnings system—which he developed ostensibly to ground his expert opinion that the product's warnings were 'inadequate and insufficient'—should be excluded due to its unreliability under the standards of Fed. R. Evid. 702." (J.A. 1267-68) Although, like the *in limine* order, this language does not appear to exclude Dr.

Kasbekar's opinions on *the inadequacy of the product warnings*, it is the lone statement in the Court's order addressing these opinions.

Without Kasbekar's opinion that the product's warnings were inadequate or his proposed alternative warning, the Court concluded that the record was devoid of evidence to create a factual dispute on the Plaintiff's warning defect claim. (J.A. 1278)  In examining the reasonableness of Yamaha's warnings, the Court was persuaded by Yamaha's assertion that other major jet ski manufacturers used the same industry warning, developed in conjunction with the United States Coast Guard and evaluated by the Boating Safety Advisory Council. (J.A. 1268) The Court thus found the warnings adequate as a matter of law such that they would "reasonably advise anyone who rides the PWC, including a passenger, of the very types of dangers…. and recommendations to prevent such injuries" (J.A. 1269)

Moreover, ruling that Yamaha's warnings negated its duty of safe design, the Court further granted Yamaha's motion for summary judgment on Ms. Hickerson's design defect claims as well. (J.A. 1272-76)

Given the Court's inconsistencies and "not clear" rulings on whether and why Kasbekar's opinions on the warnings inadequacies should be excluded, and because of its clearly erroneous ruling barring her design defect claim, Ms. Hickerson filed a Motion to Reconsider/Alter the Summary Judgment Order pursuant to Fed. R. Civ. P. 59(e). (J.A. 1277)  She argued that the inconsistent rulings reflected the Court's

5

misapprehension of the basis for Dr. Kasbekar's expert opinions on the warning inadequacies, which the Court guessed were "ostensibly" based on the alternative warnings he proposed. (J.A. 1281-1282) Dr. Kasbekar, instead, testified that in developing his expert opinions on the inadequacy of the warnings he relied on his experience, training, testing, industry practice, and industry standards. (*See supra*)

The District Court denied the Plaintiff-Appellant's Motion to Alter/Amend the Order on December 16, 2016, (J.A. 1453) giving Yamaha final judgment on all claims. Ms. Hickerson timely filed her Notice of Appeal on January 16, 2016. (J.A. 1478)

### SUMMARY OF ARGUMENT

Either of at least two simple and inexpensive design alterations—Yamaha's own contoured seat back or simple seat straps for passengers to grab—would have prevented the Plaintiff's serious internal injuries, which Yamaha well knew. Indeed, Yamaha used its interchangeable "safety contour" seat on more expensive models, and it held patents for seat handholds. Hence, this is first and foremost a design defect case that the District Court erroneously precluded from going to the jury because of its misreading of a single sentence, to a single comment, to a single ambiguous provision in South Carolina's 402A statute.

In addition, the District Court erred in finding the jet ski warnings were adequate as a matter of law. The District Court abused its discretion by arbitrarily excluding expert testimony on the warnings issue and failing to allow a jury to pass on the adequacy of the location, content, and form of Yamaha's warnings of orifice injuries and how to avoid it—first, because the adequacy of warnings of risk here, as usually, is a matter uniquely suited to jury determination without expert testimony; and, second, by improperly weighing evidence in a "reasonableness" analysis.

**ARGUMENT**

## Standard of Review

Summary judgment is only appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Binakonsky v. Ford Motor Co.*, 133 F.3d 281, 285 (4th Cir. 1998). An appellate court reviews a district court's award of summary judgment *de novo*, "viewing the facts and all inferences drawn properly therefrom in the light most favorable to the nonmoving party." *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2004).

The nonmoving party is entitled to have the "credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal

theories invoked by the evidence so considered." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). In viewing the facts and "all justifiable inferences arising therefrom in the light most favorable to the nonmoving party [the court] must not weigh evidence or make credibility determinations." *Jones v. Chandrasuwan*, 820 F.3d 685, 691(4th Cir. 2016) (citations omitted).

Sitting in diversity, a federal court is obligated to apply the law of the state's highest court. *Private Mortg. Inv. Servs., Inc. v. Hotel and Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). If the highest court has not ruled upon an issue, a federal court is called upon to predict how that court would rule on the issue. *Id.* Although a state's intermediate appellate court may be the best indicia of the state law, a federal court may disregard these decisions if convinced the highest court of the state would rule differently. *Id.* (internal citations omitted). In predicting a ruling by a state's highest court, a federal court may "consider, *inter alia*: restatements of law, treatises, and well considered *dicta*." *Id.* (internal citations omitted).

The standard of review of a district court's ruling on the reliability of an expert witness under Fed. R. Civ. P. 702 is abuse of discretion. *General Elec. Co. v. Joiner*, 522 U.S. 136,139 (1997). The "most obvious manifestation [of an abuse of discretion] is a failure or refusal, either express or implied, actually to exercise discretion, deciding instead as if by general rule, or even arbitrarily, as if neither by rule nor discretion." *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993). An abuse

of discretion also occurs if the exercise of discretion "is flawed by erroneous factual or legal premises." *Id.* (internal citations omitted)

**I.    The District Court Erred in Ruling that Appellees' *Warnings* Prevented the Appellant's Claim that the Jet Ski was Defectively *Designed***

The District Court erroneously concluded that South Carolina *Products Liability* actions based on a failure to safely *design* a product are dependent on the adequacy of the product's *warnings*. As discussed below, these separate claims of product defect are independent of one another in South Carolina as elsewhere.

**A.    Warning and Design Defects are Independent Bases of Liability**

This is principally a design defect case—where a jet ski manufacturer knew that its product had previously injured passengers and that future injuries could be avoided with minimal, inexpensive, design safety improvements. When the jet ski in question was manufactured, Yamaha produced multiple interchangeable seats for its various craft. One of these seats had a "safety contour," a small seat-back Yamaha patented and tested to help prevent rear passengers from sliding off the seat into the powerful jet thrust. Yamaha also patented seat hand-holds and straps which a passenger could grasp. (J.A. 1013-1026) Thus, this is a classic design defect case where a manufacturer is subject to liability for failing to adopt reasonable design measures to prevent serious, foreseeable harm to product users. *See, e.g.*, *Branham v. Ford Motor Co.*, 701 S.E.2d 5 (S.C. 2010).

9

Rather than so holding, however, the District Court erroneously ruled that design defects are somehow cancelled out by the presence of a warning, which warning, again erroneously, it ruled as a matter of law was adequate (non-defective) in this case. All states, including South Carolina, recognize three types of defect:

> [T]here are three defects a plaintiff in a *Products Liability* lawsuit can allege: 1) a manufacturing defect, 2) a warning defect, and 3) a design defect. When a manufacturing defect claim is made, a plaintiff alleges that a particular product was defectively manufactured. When a warning defect claim is made, a plaintiff alleges that he was not adequately warned of dangers inherent to a product. When a design defect claim is made, a plaintiff alleges that the product at issue was defectively designed, thus causing an entire line of products to be unreasonably dangerous.

*Watson v. Ford Motor Co.*, 699 S.E.2d 169, 174 (S.C. 2010). A person injured by any one of these three separate types of defect may recover for his or her injury, because each of these defects is largely independent of each of the others. *See, e.g.*, *Marshall v. Lowe's Home Centers, LLC*, 2016 WL 4208090, at *20 n.29 (D.S.C. 2016) ("Contrary to Defendants' [position on the comment *j* line of cases], Plaintiff correctly recognizes a design defect claim is separate and distinct from a warning defect claim."); *Williams v. Pioneer Machinery, Inc.*, 2004 WL 6249103, *4 (S.C. Ct. App. 2004) (although the warning defect claim was properly barred because the danger was open and obvious, the defective design claim was for the jury).

This is hornbook (and nutshell) law. "[T]he three different types of product defects generate three separate independent sets of obligations for product sellers." DAVID G. OWEN, PRODUCTS LIABILITY LAW § 6.2, at 340 (West 3rd ed. 2015) (hereinafter PRODUCTS LIABILITY LAW); DAVID G. OWEN, PRODUCTS LIABILITY IN A NUTSHELL § 6.2, at 195 (West 9th ed. 2015) (hereinafter NUTSHELL).[2]

### B.    The South Carolina Supreme Court Would Reject the District Court's Erroneous Interpretation of the State's 402A Act

The District Court erroneously relied on South Carolina intermediate appellate opinions that misread South Carolina's *Products Liability* "402A Act," S.C. Code Ann. §§ 15-73-10 et seq., for the proposition that warnings cancel out design defects. This proposition is wrong, for it should be self-evident that the South Carolina General Assembly enacted the 402A statute to *assist* persons injured by defective products, not to *eliminate* their principal basis of recovery for those injuries—liability for injuries from a product's defective design.

Tired of waiting for the South Carolina Supreme Court to "adopt" RESTATEMENT (SECOND) OF TORTS § 402A, as had the supreme courts of so many other states, the South Carolina legislature enacted the "402A Act" in 1974. *See* S.C. Code Ann. §§ 15-73-10 (restating § 402A), -20 (stating last sentence of

---

[2] In the interest of full disclosure, counsel by this name notes that he is the author of these and other works with his name cited herein.

comment *n*, barring recovery for injuries from an unreasonable assumption of risk), and -30 (incorporating comments to § 402A as the Act's legislative intent).

The District Court's mistaken interpretation of the supposed relationship between design and warning defects is rooted in a line of decisions of the South Carolina Court of Appeals that misinterpreted one part of one sentence of one comment—comment *j*—to § 402A, which provides:

> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in [a] defective condition, nor is it unreasonably dangerous.

The first South Carolina case to rely on this comment was *Anderson v. Green Bull, Inc*., 471 S.E.2d 708, 710–11 (S.C. Ct. App. 1996) (2-1 decision),[3] where the majority stated that "[a] product bearing a warning that the product is safe for use if the user follows the warning is neither defective nor unreasonably dangerous; therefore, the seller is not liable for any injuries caused by the use of the product if the user ignores the warning." The next court to address comment *j* was *Allen v. Long Mfg. NC, Inc.*, 505 S.E.2d 354, 357-359 (S.C. Ct. App. 1998), which similarly misinterpreted comment *j*.

---

[3] Chief Judge Howell dissented: "I would hold, as the trial judge did, there was ample competent evidence in the record for the trial judge to submit the issue of whether the ladder was defective by design to the jury." 471 S.E.2d at 714.

12

Since these first decisions, several intermediate appellate courts, and a few (but not all) federal district court decisions, have rotely followed this mistaken view of comment *j* and South Carolina's 402A statute. *See, e.g.*, *Curcio v. Caterpillar, Inc.*, 543 S.E.2d 264, 268–69 (S.C. Ct. App. 2001), *rev'd on other grounds*, 355 S.E.2d 272 (S.C. 2003); *Aldana v. RJ Reynolds Tobacco Co.,* 2008 WL 1883404, *1 (D.S.C. 2008). *But see Marshall v. Lowe's Home Centers, LLC*, 2016 WL 4208090, at *20 n.29 (D.S.C. 2016) (reading comment *j* largely properly).

By contrast, the South Carolina Supreme Court has never accepted this wrong-headed comment *j* interpretation of the 402A statute applied by the District Court here. Instead, the Supreme Court, while never expressly addressing whether comment *j* affects the relationship between design and warning claims, has steadfastly maintained the independence of such claims, at least implicitly.[4] *See*, *e.g.*, *Watson*, 699 S.E.2d at 174 (describing each of the three types of defect separately).

---

[4] With arguably one early exception, *Claytor v. General Motors Corp.*, 286 S.E.2d 129, 132 (S.C. 1982), where the court mistakenly conflated manufacturing and design defects. In fact, after suggesting in confusing dictum that warnings alone might make a product safe, the court went on to highlight the power of risk-utility design defect jurisprudence where "we have another of the law's balancing acts and numerous factors must be considered, including the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of injury, and the obviousness of danger." 286 S.E.2d at 132.

**C.    The South Carolina Supreme Court Would Recognize that Warning and Design Defect Claims under the 402A Act Are Independent Actions**

The South Carolina Supreme Court would hold that actions for inadequate warnings and design defects are separate and distinct claims for at least four reasons.

**1.    Holding That Warnings Trump Design Safety Is Contrary To the Independence of the Three Types of Defect**

First, South Carolina's dedication to providing victims of product accidents recovery for each of the three, independent types of defect—especially design defects—is addressed both above and below. Moreover, subordinating design safety to warnings, which effectively eliminates this important duty, is contrary to common sense, good policy, and widespread American law. *See*, *e.g.*, *PRODUCTS LIABILITY LAW* § 6.2, at 341-53.

**2.    Design Defect Liability Is Vitally Important to Society**

Of all the three defects manufacturers have a duty to avoid, *design* defects are the most important:

> The concept of design defectiveness lies at the heart of *Products Liability* law. A product's design concept predetermines the extent to which use of the product will result in human injury, and modern *Products Liability* law rests foundationally on the premise that manufacturers are fairly held to answer in the courts for the basic safety of their products' designs.

14

PRODUCTS LIABILITY LAW § 8.1, at 477.  Shielding manufacturers from design safety responsibility if they simply add warnings to dangerous products would have unacceptable safety implications.  For example, electric fans with metal blades would need no caging to protect children and inattentive adults from injuries so long as the base of the fan warned "Watch out for blades!" If this were the law, design safety would become a thing of the common-law past in America, no matter how simple and inexpensive a design "fix" to a serious safety problem might be.

> **3.    Holding That Warnings Trump Design Safety Would Revive the Long-Discredited "Patent-Danger Rule" In Design Defect Cases**

Long ago, courts held that the obviousness of a product's danger barred recovery for design defect claims based on an individual's personal responsibility for avoiding evident risks—no matter how serious the danger nor how easy it was to design it away.  Yet, since the onset of modern *Products Liability* law nearly half a century ago, this archaic principle of design defect law (the "patent danger" rule) has been decisively abandoned to the point that it "essentially is dead." *Id*. §10.2, at 605.

The nationwide purge of the patent danger rule is recognized by the RESTATEMENT (3D) OF TORTS: PRODUCTS LIABILITY § 2, which notes that warnings in no way relieve manufacturers of their central duty of safe design.  Reporters' Note to cmt. *l*, at 101 (explaining that a literal reading of comment *j* to 402A out of context "is inconsistent with the judicial abandonment of the patent danger rule").

15

Consistent with modern product liability law, South Carolina rejects this ancient patent danger rule for design defects.[5] As such, the South Carolina Supreme Court surely would reject the District Court's effort to revive this unforgiving, discredited doctrine through its erroneous reading of comment *j*.

### 4. Plucking Part of a Single Sentence of Comment *j* Out of Context Is Contrary To South Carolina Law

Finally, the state Supreme Court would refuse to misread comment *j* in isolation as the District Court did because it *cannot* do so. South Carolina courts are bound to interpret and apply a statute as the legislature *intended* in enacting it, while also reading specific provisions in context of the statute's overall purpose:

> The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature, and the text of a statute is considered the best evidence of legislative intent. *Hodges v. Rainey*, 533 S.E.2d 578, 581 (S.C. 2000). "Statutory language 'must be construed *in context and in light of the intended purpose of the statute in a manner which harmonizes with its subject matter and accords with its general purpose*.'" (Cites and internal quotations omitted; emphasis added.)

*White Oak Manor, Inc. v. Lexington Ins. Co.*, 753 S.E.2d 537, 540 (S.C. 2014).

---

[5] *See, e.g.*, *Claytor v. Gen. Motors Corp.*, 286 S.E.2d 129, 132 (S.C. 1982) (in design defect determinations, "numerous factors must be considered, including the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of injury, and the obviousness of danger"); *Williams v. Pioneer Mach., Inc.*, 2004 WL 6249103, at *4 (S.C. Ct. App. 2004) (although the warning defect claim was properly barred because the danger was obvious, "the open and obvious nature of the blind spot was, as to the claim for defective design, merely one of the factors to be weighed by the factfinder").

The evident purpose of the South Carolina General Assembly in enacting the 402A statute (as the evident purpose of RESTATEMENT (2D) OF TORTS § 402A itself) was to provide courts with modern, plaintiff-friendly principles of the doctrine of strict *Products Liability* in tort as those principles were rapidly developing and expanding in 1974.  Indeed, this was in fact the particular purpose of S.C. Code Ann. § 15–73–30 (comments to REST. (2D) OF TORTS § 402A adopted as legislative intent of the Act), which the drafters conceived as alerting courts to this purpose of the Act.[6]

More specifically, the limited intent of comment *j* to § 402A (and comments *i* and *k*) was to address a particular, narrow concern of the ALI Advisers to the SECOND RESTATEMENT on what type of products should *not* be covered by the principle of "strict" liability in tort. The Advisers voiced concerns with possible ramifications of early drafts of § 402A, which drafts were limited to food products (and drugs).  The Advisers feared that these early drafts would impose a new doctrine of *strict liability* for harm on sellers of such inherently dangerous products as alcohol (that can make people drunk); butter (that may deposit cholesterol and hence lead to heart attacks); tobacco (that can cause lung cancer); and drugs, such as the Pasteur rabies vaccine (that can cause harmful side effects).

---

[6] The basis for our assertion is that one of plaintiff's counsel directed the legislators' drafting of this Act, explaining this goal to them—to allow South Carolina courts to draw from rapidly evolving principles of modern *Products Liability*  law around the nation—which resulted in subsection-30.

Initially, Dean Prosser addressed these issues in a single comment f, explanations that he later expanded into three comments, i, j, and k.[7] Even as Prosser expanded the types of products covered by 402A from food (and drugs) to *all* products, these three comments continued to limit their coverage to products that are *"unavoidably"* dangerous—useful products that inherently involve dangers that cannot be designed away. This limited intent of comment j has been lucidly explained:

> Comment j . . . concludes with this curious language:
>
> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in [a] defective condition, nor is it unreasonably dangerous.
>
> . . . [R]esearch has revealed that its actual meaning is far more limited than suggested above—that it really means only that sellers of inherently dangerous products like certain foods, alcohol, tobacco, and prescription drugs, in addition to supplying them free of impurities, need only warn consumers of any unavoidable, latent dangers such products foreseeably may contain. This narrow interpretation has been shown to be correct because of the purpose of comments i, j, and k— all of which were written by Dean Prosser to allay concerns at the time that inherently hazardous but useful products like those just mentioned would give rise to liability for the harmful consequences of their unavoidable risks notwithstanding the inability of manufacturers to design away such inherent hazards.

---

[7] *See* PRODUCTS LIABILITY LAW § 6.2, at 345.

With the exception of a handful of misguided decisions that have misinterpreted comment *j* as negating the general duty of safe design, a great majority of courts, some explicitly rejecting the more general assertion of comment *j*, hold that the separate forms of defect give rise to separate obligations that may independently support a *Products Liability* claim. The *Products Liability* Restatement is in accord. Thus, except in certain limited contexts, it is abundantly clear that a manufacturer is subject to liability for a product's . . . design defects, no matter the precision of its manufacture or the abundance of its warnings. . . .

The courts have quite colorfully expressed this idea. *See Rogers v. Ingersoll-Rand Co*., 144 F.3d 841, 844 (D.C. Cir. 1998) (a manufacturer may not "merely slap a warning onto its dangerous product, and absolve itself of any obligation to do more"); *Glittenberg v. Doughboy Recreational Indus*., 491 N.W.2d 208, 216 (Mich. 1992) ("A warning is not a Band-Aid to cover a gaping wound, and a product is not safe simply because it carries a warning."). More succinctly, warnings do not trump design.

NUTSHELL, 196–98.[8]

Indeed, this is how American jurisprudence on § 402A has developed in the vast majority of states, either *sub silentio*, or, as in the cases just cited, explicitly repudiating the wrong-headed, out-of-context interpretation of comment *j* adopted

---

[8] For similar but more complete expositions, with exhaustive citations, *see* David G. Owen, *The Puzzle of Comment j*, 55 HASTINGS L.J. 1377 (2004); DAVID G. OWEN and MARY J. DAVIS, OWEN & DAVIS ON *PRODUCTS LIABILITY* § 6:3, at 512–30 (Thomson Reuters 4th ed. 2014); *PRODUCTS LIABILITY* LAW § 6.2, at 341–53. *See also* DAVID G. OWEN and MARY J. DAVIS, *PRODUCTS LIABILITY* AND SAFETY: CASES AND MATERIALS, ch.9, at 337–38 n.4 (Foundation Press 7th ed. 2015) (hereinafter *PRODUCTS LIABILITY* & SAFETY); David G. Owen, *Warnings Don't Trump Design: The Rise and Fall of § 402A Comment j*, 153 *Products Liability* ADVISORY 1 (Nov. 2001).

by some South Carolina Courts of Appeals and the District Court here.[9]  In the broader context of the 402A Act's plaintiff-protective purposes, then, the pertinent language of comment *j* must be limited, as it was intended to be read, to *unavoidably dangerous* products—certainly not to a jet ski that easily could and should have been designed with adequate safety for passengers.

If there could be any doubt as to the position of the South Carolina Supreme Court on this statutory interpretation issue, that Court has decisively repudiated the District Court's interpretation of comment *j*, if implicitly, by adopting the RESTATEMENT (3D) OF TORTS: *PRODUCTS LIABILITY* § 2(b) definition of design defect in *Branham v. Ford Motor Co.*, 701 S.E.2d 5, 14 (2010).  In adopting the THIRD RESTATEMENT's § 2(b) "risk-utility" definition of design defect, the South Carolina Supreme Court superseded the SECOND RESTATEMENT's "consumer expectations" definition of a design defect in § 402A's comments *g* and *i*.

---

[9] See the sources above for numerous citations to the proposition that comment *j* will not be used to allow warnings to trump design claims.  For most citations, *see* OWEN & DAVIS ON *PRODUCTS LIABILITY*, *supra* note 7, § 6:3, at 527–28 nn. 54 and 59. At least one federal court in South Carolina rejected the appellate courts' wrong-headed interpretation of comment *j* as barring design defect claims. *See Marshall v. Lowe's Home Centers, LLC*, 2016 WL 4208090, at *20-22 n.29 (D.S.C. 2016) ("Contrary to Defendants' [position], Plaintiff correctly recognizes a design defect claim is separate and distinct from a warning defect claim.").

The Supreme Court explained its switch from the SECOND RESTATEMENT to the THIRD: "We believe the Legislature's foresight in looking to the American Law Institute for guidance in this area is instructive. . . . The Legislature has expressed no intention to foreclose court consideration of developments in *Products Liability* law." And the THIRD RESTATEMENT speaks plainly on the very issue in this case in comment *l* to § 2, entitled "*Relationship between design and instruction or warning*," where it observes:

> In general, when a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks. . . . Warnings are not . . . a substitute for the provision of a reasonably safe design.[10]

By adopting § 2(b) of the THIRD RESTATEMENT in *Branham*, the South Carolina Supreme Court implicitly adopted its explanatory comments, including comment *l*.

Therefore, the only *proper* interpretation of comment *j* to § 402A and South Carolina's 402A statute is that this comment applies only to *unavoidably* dangerous products, meaning products whose inherent dangers simply cannot be reduced by a safer design. As the true interpretation of comment *j*, this means that the South Carolina General Assembly, in the 402A statute, in no way said that a product's

---

[10] For an explanation of this view, explicitly rejecting the "unfortunate language" of the pertinent portion of comment *f* to § 402A of the SECOND RESTATEMENT, *see* RESTATEMENT (3D) OF TORTS: *PRODUCTS LIABILITY* , Reporters' Note to § 2, cmt. *l*, at 100-101. In the interest of full disclosure, counsel notes that he was the Editorial Adviser of this RESTATEMENT.

21

warnings negated a manufacturer's duty to minimize dangers to users and consumers by adopting safe designs that are simple, practicable, and otherwise reasonable.

Accordingly, this means that the District Court here relied on a line of South Carolina lower court cases that misreads the statutory intent of the legislature, a misinterpretation that grossly distorts the role of a manufacturer's duty of safe design in ordinary cases like this, and which conflicts with the state Supreme Court position on this important principle. That is, even if comment *j*'s last sentence were for some reason to be properly read out of context in the 402A statute—to mean that warnings cancel out a manufacturer's duty of safe design—the Supreme Court has superseded such a perverse reading by its adoption of the THIRD RESTATEMENT's § 2(b) and § 2's comment *l*, which repudiates any mistaken, out-of-context reading of the SECOND RESTATEMENT's comment *j*.

For all of these reasons, the South Carolina Supreme Court would reject the District Court's interpretation of the 402A Act as bad policy and contrary to South Carolina law which recognizes that warning and design defect claims are separate and distinct.

## II. The District Court Erred in Ruling that Yamaha's Jet Ski Warnings Were Adequate as a Matter of Law

Although this case first and foremost concerns the jet ski's defective design, it also, importantly, is a defective *warning* case. Although the record is replete with

22

evidence that the jet ski's warnings were inadequate, the District Court abused its discretion when it erroneously ruled that the warnings were adequate as a matter of law. The Court based its ruling on: (1) its exclusion of expert testimony it found unreliable based on an assumption instead of a *Daubert* analysis; (2) its effective ruling that expert testimony was needed although the inadequacies of the warnings were evident upon inspection and hence within the common knowledge of the jury; and (3) its improper weighing of evidence in the record. (J.A. 1267-69)

### A.    The District Court Wrongfully Excluded Expert Testimony By Assuming Its Basis Instead of Conducting a Reliability Analysis.

Under Federal Rule of Evidence 702, expert testimony is admissible if the expert is qualified "by knowledge, skill, experience, training, or education" and the testimony is: (1) helpful to the trier of fact; (2) "based on sufficient facts or data"; (3) "the product of reliable principles and methods"; that (4) have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. Although the proponent of expert testimony does not have a burden to "prove" anything, the proponent must produce "evidence from which the court can determine that the proffered testimony is properly admissible." *Md. Cas. Co. v. Therm-O-Disk, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998).

The Supreme Court listed certain factors that may guide courts in making reliability determinations of exert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993). These factors include: (1) whether the particular scientific theory can be (and has been tested); (2) whether the theory has been

23

subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community. *Id.*

Initially, it is undisputed that the District Court qualified Kasbekar as a warnings expert. Under *Daubert*, the court's next step was to determine the reliability of Kasbekar's opinions. Even though a District Court is given broad discretion to determine reliability, it must actually *exercise* its discretion. The District Court, however, conducted no reliability analysis under any factors—those articulated in *Daubert*, by the Advisory Committee on Fed. R. Evid. 702, Note to 2000 Amendments, *in PRODUCTS LIABILITY & SAFETY*, at 197-98, by this Court, or by any other court—to help determine the reliability of Dr. Kasbekar's opinions concerning the inadequacy of the warnings here. Instead, the District Court arbitrarily assumed that Dr. Kasbekar's opinion was "ostensibly" based on his proposed alternative warning , and thereupon declared it to be "unreliable." (J.A. 1267-68)

The District Court started its analysis of Dr. Kasbekar's warning opinions by noting that he testified, consistent with his report, that the jet ski's warnings were inadequate. (J.A. 1251) Next, Dr. Kasbekar offered an alternative warning for passengers in particular—a condensed warning, developed in collaboration with

24

another warnings expert—which he stated should be placed on an unobstructed location in front of the passenger that highlighted the risk of orifice injuries. (J.A. 1252)

As for the alternative warning, the Court's order on Yamaha's motion *in limine* to exclude Dr. Kasbekar's opinions analyzes the reliability of his opinions based on the *Daubert* testing and research factors. (J.A. 1253) However, the *in limine* order failed to undertake any reliability analysis on Dr. Kasbekar's opinions on the inadequacy of the jet ski warning labels and appeared to allow these opinions on inadequacy to proceed.

Contrary to the *in limine* order, the District Court granted the Defendants' Motion for Summary Judgment by oddly, and confusingly, ruling that the Plaintiff had no expert testimony on the warnings issues in the case. (J.A. 1270) Although this Order also failed to expressly exclude Kasbekar's warning opinions—or to conduct any reliability analysis as to those opinions—the District Court, apparently, *sua sponte* reconsidered it's *in limine* Order and excluded Kasbekar's opinions that Yamaha's product warnings were inadequate.

Without conducting the required reliability analysis of Dr. Kasbekar's expert opinions on the inadequacy of the jet ski warnings, the District Court erroneously *assumed* that these opinions were based on his proposed alternative warning "system":

While this court determined that Dr. Kasbekar was qualified as an expert to issue this opinion, (ECF No. 104 at 6-7), it concluded that his proposed warnings system—which *he developed ostensibly to ground his expert opinion that the product's warnings were "inadequate and insufficient"*—should be excluded due to its unreliability under the standards of Fed. R. Evid. 702.

(J.A. 1267-68) (emphasis added)

Assuming, *arguendo*, that this statement does exclude Dr. Kasbekar's warning inadequacy opinions, the Court plainly conducted no reliability analysis whatsoever. At best, the Court excluded Dr. Kasbekar's inadequacy opinions on the mistaken factual premise that those opinions were somehow "ostensibly" based on the alternative warnings that he proposed.

The record, however, shows this assumption to be incorrect. Rather than being based on the alternative warning, Dr. Kasbekar's testimony revealed that he based his criticism of the product warnings on: (1) other warning labels in use on competitors' products in the industry; (2) ANSI[11] industry standards; and (3) his own testing of the Yamaha jet ski. For example, Kasbekar testified, unchallenged, that a warning label on an industry competitor's product more accurately reflected the color of a wetsuit bottom. (J.A. 411-12) He explained that a competitor's warning depicted a person wearing a "black" wet suit bottom, while Yamaha's had a "white bottom." (J.A. 411-12) Because "white" wetsuit bottoms were not as common in watersports, he opined

---

[11] American National Standards Institute

the competitor's wetsuit depiction should have been utilized.  (J.A. 412)

Next, Kasbekar cited ANSI 535, an industry warnings standard, as a basis for opining that the product label is congested with too many warnings.  (J.A. 413-14) Consistent with this testimony, Dr. Nathan Dorris (Dorris), Yamaha's own warning expert, conceded that ANSI 535 is an industry standard. (J.A. 1069)

Lastly, Dr. Kasbekar opined that the warning did not adequately inform users of proper methods to avoid the dangers of the contact with the jet thrust.  Yamaha's warning indicates that avoiding the jet thrust is accomplished by a passenger affirmatively taking an action to acquire and wear a wet suit or other apparel that "provides equivalent protection." (J.A. 715)  Dr. Kasbekar conducted on-water testing in which a male user wearing a wetsuit contacted the jet thrust and experienced enough discomfort and pain that he was reluctant to replicate the testing in the future.  (J.A. 690-91)  In response, Kasbekar refused to subject a female tester to the same contact with the jet thrust.  (J.A. 563-64)  This testing lead Dr. Kasbekar to opine that the warning did not effectively convey how to avoid injuries through use of a wetsuit or "clothing providing equivalent protections." (J.A. 563-64)  He opined that all wetsuits, depending on thickness, might not guard against injury and, therefore, "equivalent protection" is confusing. (J.A. 552-553)

Thus, the District Court failed to subject Dr. Kasbekar's expert opinions on the inadequacy of the jet ski warnings to a fair standard of reliability.  Under well-

settled *Daubert* law, the Court was required to assess the reliability of Dr. Kasbekar's opinions rather than merely make an arbitrary assumption on their foundations. Had the District Court instead followed the guidance of *Daubert* and FED. R. EVID. 702, and analyzed the reliability of these opinions, the District Court would have seen that they are indeed reliable under the relevant case law. *See e.g.*, *Marshall v. Lowe's Home Center, LLC*, 2016 WL 4208090, at \*4-5 (D.S.C. 2016) (noting industry standards and ANSI standards are indicia of reliability of expert opinions).

Even though Dr. Kasbekar's opinions on warning inadequacy meet judicially-approved reliability factors, these testing and other factors are often inapt for assessing the reliability of expert testimony product *warnings*. As Yamaha's expert, Dr. Dorris, explained, the process for measuring warnings is abstract, "it's not necessarily about a specific measurement." (J.A. 829) He further stated that in evaluating warnings, "it's not about going out and doing some specific data collection" and more like "compar[ing] … against what is appropriate and recognized in the [warnings] field." (J.A. 830) Consistent with these standards for evaluating warnings, Dr. Dorris testified that actually developing a warning does not require testing in the industry and may merely involve vetting other warnings experts in the field—the process the District Court recognized Dr. Kasbekar utilized to develop his proposed warning. (J.A 1069-1071, 1252)

28

Under these circumstances, the quality of expert testimony is still largely to be tested by cross examination and other standards of the adversary system. *See*, *e.g.*, *Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir. 2008) ("The District Court's inquiry of the reliability of [the warning expert's] methodology did not demonstrate the appropriate level of flexibility required by Rule 702 and our past precedent"; development and testing of alternative warnings unnecessary for experienced expert to opine that "the lack of instructions was a safety issue for the technician"); *Bradley v. Ameristep, Inc.*, 800 F.3d 205 (6th Cir. 2015) (reversing summary judgment for manufacturer because the district court abused its discretion by excluding plaintiffs' expert's testimony and requiring plaintiffs to present expert testimony on failure to warn claims); Advisory Committee on Fed. R. Evid. 702, Note to 2000 Amendments, in *PRODUCTS LIABILITY* & SAFETY, at 197-98.

## B.     The Court Erred in Ruling Effectively that the Jury Could Not Determine Adequacy of a Warning Without Expert Testimony

Today, most states hold that the appropriateness of expert testimony on adequacy is similar to its appropriateness in other types of cases, to wit, dependent on whether the issue is "beyond the ken" of the jury (or, under federal and South Carolina rules of evidence, whether such testimony would be helpful to the jury). Fed. R. Evid. 702(a); S.C. R. Evid. 702.  South Carolina adheres to this general principle of expert testimony—that it is allowable, and in some cases may be necessary, but only on matters beyond the ken of the jury and dependent on "the

particular facts of the case." *Babb v. Lee County Landfill SC, LLC*, 747 S.E.2d 468, 481 (S.C. 2013) ("where a subject is beyond the common knowledge of the jury, expert testimony is required.").

Since jurors regularly encounter all types of warnings, the adequacy or inadequacy of product warnings has long been considered a question of fact particularly suited to jury determination. *See McCullock v. H.B. Fuller Co*., 981 F.2d 656, 657 (2d Cir. 1992) (noting that inadequacy of warning was jury question without expert testimony when plaintiff did not see the warning because of its location); *see also Ruggiero v. Yamaha Motor Corp., USA*, 2017 WL 1197755, at *11 (D.N.J. 2017) (determining, on nearly identical facts as the case at bar, that adequacy of the location of a warning for an injured passenger on a Yamaha jet ski was a question of fact for the jury without expert testimony).

Indeed, in South Carolina-- and taking into account that South Carolina law does not require a proposed alternative warning-- "[t]he adequacy of a warning is generally a jury question." *See Allen v. Long Mfg. NC, Inc.*, 505 S.E.2d 354, 357 (S. C. Ct. App.1998); *Curcio v. Caterpillar, Inc.*, 585 S.E.2d 272, 274 (S.C. 2003). *Allen* is widely cited for its statement that "[o]nce it is established that a product must display a warning to be safe, the question of the adequacy of the warning is one of fact for the jury as long as evidence has been presented that the warning was inadequate." *Allen*, 505 S.E.2d at 357.

30

In *Curcio*, the South Carolina Supreme Court emphasized that a warning's adequacy is a question of *fact*—without including the qualifying "as long as evidence has been presented" language. *Curcio*, 585 S.E.2d at 274. Thus, South Carolina law now effectively requires the warning adequacy issue to go to the jury if there is any plausible basis for that claim.

An early example of this principle is *Gasque v. Heublein, Inc*., 315 S.E.2d 556, 558–59 (S.C. Ct. App. 1984), where the plaintiff's eye was injured by a stopper and cork assembly that prematurely ejected from a bottle of sparkling wine that bore an allegedly inadequate warning. Even though an expert testified as to the warning's inadequacy, the court concluded "the language of *the warning itself*, its placement on the back neck of the bottle and its print size created a jury question as to its adequacy." *Id.* at 560 (emphasis added).

In this case, the location, content, and form of the warning are particularly suited for judgment by a juror without expert testimony. First, the main warnings are located in front of the driver of the jet ski, a location blocked from a passenger's view by the driver. The secondary warning on the back of the craft is behind the passenger and also out of view, blocked by the seat. Even when they are not blocked, the main orifice injury warning is displayed in small font, within other warnings, that is not conducive to reading from the passenger's seat. The secondary warning is also displayed in small writing, grouped with advertising stickers that are much

31

larger and draw attention away from the warning itself. Neither location, coupled with the size of the warning, make the warnings viewable from the passenger's location during normal use.

Next, the *content* of the warning concerning the danger of severe orifice injuries did state the harsh risk that powerful jet-propelled water could seriously injure the anus and vagina of people in the water, with instructions to wear a wetsuit (or equivalent protection) as means of avoidance. A jury could easily conclude, however, that the warning fails to specify the *hidden danger* of falling off the jet ski into the jet thrust during operation and passengers should have been informed of how vital it was for them to *stay on the craft* in order to avoid this horrendous risk. The jury could also use its experience and knowledge to conclude that the warning's reference to clothing offering "equivalent protection" to a wetsuit is confusing and inadequate. Thus, the warning was incomplete no matter how harshly the language described the risk and its avoidance.

Furthermore, the warnings on the jet ski were "procedurally" inadequate for passengers in the *form* of the warnings. *See PRODUCTS LIABILITY & SAFETY* at 303 note 1 ("Even if the substantive content of a warning is full, fair, and accurate, it will do no good unless it (1) reaches the user, (2) catches his attention, and (3) penetrates his mind.").[12]

---

[12] *See* L. FRUMER and M. FRIEDMAN, *PRODUCTS LIABILITY* § 12.03[1] (C. SKLAREN rev. ed. 2017):

The form of the warnings, and Yamaha's entire warning system, inadequately catches passenger's attention because their location and content are directed at the driver or owner. The warnings are contained in owner's manuals, owner's purchase materials and checklists, owner's videos, and warnings situated in front of the driver with driver instructions for operating the jet ski. The passenger, who is at the greatest risk for an orifice injury, has not one warning situated near the passenger seating area.

Hence, the warnings' *location* (not visible to passengers with small wording), *content* (failure to convey specific risks of falling off jet ski into jet thrust and means to avoid danger), and *form* (verbosely directed at owner's and drivers but not at passengers), in combination could easily be viewed as inadequate by a jury within their common knowledge. Thus, the jet ski warnings were surely not *adequate* as a matter of law, and their very plausible *in*adequacy was a crucial, open question of fact for the jury in this case.

---

A legally adequate warning . . . has two essential characteristics—form and content. It must be given in a form that "could reasonably be expected to catch the attention of the reasonably prudent man in the circumstances of its use," while its content "must be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person." A verbose warning may be deemed as inadequate as a sparse warning: too many details can have the undesirable effect of making a warning too technical and confusing.

33

**C.**     **The District Court Erred By Usurping the Role of the Jury and Weighing the Evidence on the Inadequacy of the Jet Ski Warnings**

Even if this Court finds expert testimony is required, and that the District Court properly excluded Dr. Kasbekar's testimony, summary judgment should have been denied because the record contained other evidence of the inadequacy of the jet ski warnings. The District Court usurped the role of the jury by improperly weighing that evidence instead of determining its existence.

At the summary judgment stage, where evidence must be viewed in the light most favorable to the nonmoving party, a district court's function is not to weigh evidence. *Alford v. Lowe's Home Centers*, Inc., 2014 WL 5305825 at *3 (D.S.C. 2014). Even when the expert testimony "speaks contrarily to the Court's private view of it," a court is still prohibited from weighing that evidence. *Id.* (internal citations omitted).

In addition to Dr. Kasbekar's warning opinions, Yamaha's own warning defect expert, Dr. Dorris, conceded that certain aspects of the products warnings were inadequate. First, he admits that the front "glove box" warning directly in front of the driver inadequately warned back passengers like Ms. Hickerson whose vision might be blocked by the driver and other passengers. (J.A. 833-34) For this reason, Dorris oddly testified that the best time to read the warning is not when the passenger is seated on the jet ski (J.A. 834), but in advance of the activity during an "information-

seeking" mode, and with supplementation from information outside the warning itself. (J.A. 834, 840-41)   However, he noted that in his experience and familiarity, recreational boaters may not choose to engage in "information-seeking" activity.  (J.A. 839-840) Further, he acknowledges that passengers may not always have access to the information outside the warning.  (J.A. 844-45)

Next, and consistent with Dr. Kasbekar's testimony that the label was too congested under ANSI 535, Dorris testified that because of the numerous warnings on the Yamaha product, they had to "chunk" the warnings into information groups, with the intent to aid users and facilitate recall.  (J.A. 837-38)

Additionally, as to the warning on the back of the craft, Dorris admitted that it was included in the middle of "brand information" stickers stating "Yamaha" and "Nano Xcel" that were larger than the actual warning.  (J.A. 848)  He also conceded that a user would likely see this warning principally during reboarding the jet ski when a user in the water may be directly exposed to the very jet thrust the user is being warned to avoid.  (J.A. 850, 1101)

Thus, although Yamaha's own expert introduced considerable evidence on the inadequacy of the warning labels— including locations that are not easily viewable and blocked at times; inability of users to recall all of the numerous warnings easily; and, disguising of warnings amongst larger advertising stickers—the District Court failed to acknowledge these inadequacies and, instead, weighed evidence against

Ms. Hickerson. The Court evaluated evidence in its "reasonableness" analysis, relying on the assertion that the warning label was designed and tested by the manufacturers of the personal watercraft industry. The Court then determined—*sua sponte*—that the product warnings "reasonably" advised riders of the jet ski's dangers and how to avoid them. (J.A. 1268-69)

Finally, by relying on the manufacturers' use of similar warnings on jet skis, the Court effectively held that conforming to industry custom is a conclusive defense to a manufacturer's liability for selling a defective product. Yet South Carolina courts, together with a large majority of jurisdictions, have rejected similar efforts by manufacturers to conclusively set their own industry standard.[13]

Rather than weighing the evidence, the District Court should have properly noted the considerable body of record evidence that Yamaha's warnings were inadequate. Accordingly, the Plaintiff respectfully submits that the District Court abused its discretion and otherwise erred in ruling that the record was devoid of *any* evidence, apart from Ms. Hickerson's erroneously excluded expert testimony, sufficient to defeat summary judgment on the Plaintiff's warning defect claims.

---

[13] *Long Mfg, NC, Inc.*, 505 S.E.2d at 358-59 ("disagree[ing] with the trial court's determination that the adequacy of a warning is conclusively established by industry standards"); s*ee generally* PRODUCTS LIABILITY LAW § 6.4, at 382-87 (explaining the applicability of the "*T.J. Hooper* rule" to *Products Liability* cases).

36

## CONCLUSION

The Plaintiff-Appellant, Deborah Meek Hickerson, whose evidence was sufficient for jury determination of both her design and warning defect claims, respectfully asks this Court to reverse the District Court's summary judgment for the Defendant-Appellees, Yamaha, and remand for trial on all claims.

Respectfully submitted,

**s/ Douglas F. Patrick**
Douglas F. Patrick (ID #300)
Covington, Patrick, Hagins, Stern & Lewis
P. O. Box 2343
Greenville, SC 29602
P: (864) 242-9000
dpatrick@covpatlaw.com

**s/ Austin F. Watts**
Austin F. Watts (ID #12120)
Covington, Patrick, Hagins, Stern & Lewis
P. O. Box 2343
Greenville, SC 29602
P: (864) 242-9000
awatts@covpatlaw.com

**s/ David Owen**
David G. Owen
David G. Owen, PA
305 Colleton Ave. SE
Aiken, SC 29801
P: (803) 644-1441
dowen@law.sc.edu

*Attorneys for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

The Plaintiff-Appellant, Deborah Meek Hickerson, respectfully requests oral argument. In accordance with *Federal Rule of Appellate Procedure* Rule 34(a)(2) and Fourth Circuit Local Rule 34(a), this non-frivolous appeal would be significantly aided by oral argument.

Importantly, the dispositive issues in this case have not been authoritatively decided. The Court of Appeals thus is presented with an opportunity to clarify, explain, or modify the law in the District of South Carolina. For instance, within the district, there are differing decisions on whether a product warning negates a plaintiff's otherwise sufficient design defect claim. *Compare Marshalls v. Lowe's Home Centers*, 2016 WL 4208090 (D.S.C. 2016), *with Aldana v. R.J. Reynolds Tobacco, Co.*, 2007 WL 3020497 (D.S.C. 2007).

Additionally, the appeal presents an opportunity to decide important issues of law concerning expert testimony. Specifically, the Court of Appeals is faced with deciding when expert testimony is needed in a product liability case and the boundaries for excluding expert testimony without a reliability analysis.

Because this appeal thus represents an opportunity to clarify the law on issues of public interest, and aid this Court in deciding the issues, oral argument should be granted.

**s/ Austin Watts**
Austin Watts, Esq.

38

## CERTIFICATE OF COMPLIANCE

In accordance with *Federal Rules of Appellate Procedure* Rules 29(c)(7) and 32(a)(7)(c), the undersigned certifies that this brief complies with the applicable type-volume limitations.  Exclusive of the portions exempted by *Federal Rule of Appellate Procedure* 32(a)(7)(B)(iii), this brief contains 9,035 words.  This Certificate was prepared in reliance on the word-count function of Microsoft Word used to prepare the text of this brief.

The undersigned further certifies that the brief complies with the typeface and type-style requirements of *Federal Rules of Appellate Procedure* Rule 30(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times Roman font.

**s/ Austin Watts**
Austin Watts, Esq.

### CERTIFICATE OF SERVICE

I hereby certify that, on the 14th date of June 2017, the foregoing *Opening Brief of Appellant* was filed electronically with the Clerk of Court for the Fourth Circuit Court of Appeals using the CM/ECF system. This CM/ECF system sent notice of such filing to all participants in the case who are registered CM/ECF users.

**<u>s/ Austin Watts</u>**
Austin Watts, Esq.